Santos **BADILLO**, Individually and on behalf of all others similarly situated, et al., Intervenors,

v.

**DALLAS COUNTY COMMUNITY ACTION COMMITTEE, INC.**

No. CA 3–5932–C.

United States District Court,
N. D. Texas,
Dallas Division.

April 28, 1975.

As amended June 6, 1975.

Edward B. Cloutman, III, Mullinax, Wells, Mauzy & Baab, Inc., Dallas, Tex., for Badillo and Medrano.

James A. Johnston, Johnston & Dixon, Michael L. O'Neal, Dallas, Tex., for Cervantes and Sepulvida.

Rosenfield, Mittenthal & O'Neal, Frank P. Hernandez, Dallas, Tex., for Arredondo.

William V. Dorsaneo, III, and Rick Graham, Geary, Brice, Barron & Stahl, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

The five individual plaintiffs in this case bring this suit under the Civil Rights Acts of 1866 and 1964, claiming that the defendant Dallas County Community Action Committee (hereinafter referred to as the "DAC") discriminated against them because of their Mexican-American national origin. In addition to seeking back pay, reinstatement, original job positions, and promotions allegedly improperly denied them, the plaintiffs also request preliminary and permanent injunctive relief designed to restrain the DAC from maintaining policies, practices or customs whose effect is to deny or deprive them of employment opportunities with the defendant on the basis of their national origin.

The individual plaintiffs also represent a class of people (divided into two sub-classes) which attempt to enjoin the defendant DAC from either intentionally or inadvertently discriminating against the plaintiffs on the basis of their national origin either with regard to employment opportunities, promotions, and

terminations or with regard to the delivery and receipt of services offered to the Dallas Community by the defendant.

The Court finds that it has jurisdiction of this action under 42 U.S.C. §§ 1981 and 2000e–5, and further by 28 U.S.C. §§ 1343(3) & (4) and §§ 2201, 2202.[1] Subject matter jurisdiction over the defendant Dallas County Community Action Committee, a creation of a federal statute entitled the Economic Opportunity Act of 1964, 42 U.S.C. § 2701 et seq., and the regulations promulgated thereunder, exists pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which requires that federally-assisted programs and activities be operated in such a way as to eliminate or at least not foster discrimination within its ranks.

Although employment discrimination cases and other suits involving race and national origin discrimination never follow the usual and expected chain of events, the instant case has several peculiarities which distinguish it from even the normal Title VIII case. Typically, an employment discrimination suit pits an individual or group of unhired, or fired, or unpromoted minority plaintiffs against a white or Caucasian-controlled employer. However, in the instant case, a group of five individual Mexican-Americans sue in their own behalf and on behalf of other Mexican-Americans similarly situated with regard to the defendant DAC, alleging that the organization through Black officials sitting in middle or higher level management positions have either intentionally or inadvertently adhered to policies and employment decisions which effectively discriminated against the plaintiff Mexican-American DAC employees and job applicants on the basis of their national origin. Thus, the situation involves one minority group suing another minority for its discriminatory conduct.

Another interesting facet of this case concerns the defendant DAC. In 1964, Congress passed the Economic Opportunity Act for the purpose of authorizing various organizational entities and related programs designed to attack and eliminate the principal causes of poverty among U.S. citizens—lack of education, poor health, absence of marketable vocational skills, and unstable family lives—by providing them with, among other things, opportunities to earn a decent living and to maintain their families on a comfortable living standard. *See*, 1964 United States Code Congressional and Administrative News, Legislative History of P.L. 88–452 at Vol. 3, p. 2900. Pursuant to the amended section 42 U.S.C. §§ 2701 and 2790 of the Economic Opportunity Act, the defendant DAC was created as a private, non-profit organization designated as the community action agency for Dallas County. Financed through federal Office of Economic Opportunity funds pursuant to 42 U.S.C. § 2808 et seq., as well as state, local and private funds, the DAC endeavors to adopt programs to utilize these resources in such a way as to assist the poor of Dallas County in coping with the many difficulties of urban living. Several of the DAC's programs designed to aid the poor are indirectly involved in this suit. Directed to use local capabilities to coordinate all programs in the community, the Director of the DAC, according to 42 U.S.C. §§ 2809 and 2811 has the authority to promote such service projects as Manpower, legal services, Headstart, drug rehabilitation and comprehensive health services. These service projects and other programs are administered through Neighborhood Service Centers, of which there are presently

---

1. 42 U.S.C. § 1981 provides the means of access to United States Courts to enforce the rights of all minority individuals to the full extent of the laws guaranteed by white citizens.

28 U.S.C. § 1343(4) provides that the U. S. District Courts shall have original jurisdiction of any civil action authorized by law wherein a person seeks to recover damages or secure equitable or other relief under any Act of Congress for the protection of civil rights.

four in Dallas County, and auxiliary branches called Community Houses, of which Dallas has normally had a total of between eighteen and twenty-two. The location of the various centers and community houses became a disputed matter during the trial of this lawsuit in that the plaintiffs claimed the lack of them in Mexican-American neighborhoods substantially reduced and therefore caused disparate availability of their services to the plaintiffs. The plaintiffs contend that the job referral notices, since they were usually posted on the center and community house bulletins, failed to achieve fair notice to Mexican-Americans who lived outside any reasonably proximate area to the facilities.

In addition to this class-wide complaint about the location of the various administrative offices and distribution points in regard to services offered and performed, the individual plaintiffs felt personally discriminated against by the DAC. Badillo, the principal individual plaintiff, complained that his position as "job development specialist" with the Manpower program, was terminated only because of his keen interest in alleged discriminatory practices conducted by DAC officials against his fellow Mexican-Americans. In effect, he claimed that his termination resulted not from a failure to adequately perform his duties but in essence because Mrs. Morrison and other supervisory personnel within DAC discriminated against him on the basis of his national origin. The Manpower program involves the creation of employment centers and employment service units pursuant to 42 U.S.C. § 2738 et seq., for the purpose of providing disadvantaged enrollees in the program with education, vocational training, work experience, and job placement and counseling opportunities. Under 42 U.S.C. § 2737, community participation and cooperation is greatly stressed. In accordance with that philosophy, the plaintiff Badillo was hired to help create job opportunities, sponsored and administered as a comprehensive program by

the DAC, for poverty level individuals in Dallas County.

The Director position of the DAC and other components, such as the Manpower program, held especial prominence in the eyes of DAC employees not only for its inherent political power, but in addition for the increased pay and job responsibilities connected with it. Mr. Medrano, another individual plaintiff, sought the Deputy Directorship of the DAC, after having been the director of a neighborhood service center and the Director of the Neighborhood Service System, the latter capacity of which he now maintains.

Closely associated with the Manpower comprehensive work and training program administered, coordinated, and evaluated overall by the DAC, are supportive and follow-up services necessary to assist disadvantaged individuals in achieving successful training, job experience and opportunities such as health services, day care for children, and transportation assistance. The outlying community houses with their staff of administrators, aides and other personnel are designed to effectuate those purposes in Dallas. Mrs. Cervantes, another plaintiff, served as a community house aid until May 19, 1972, when, as she claims, the DAC terminated her job position on account of her being a Mexican-American.

The other two individual plaintiffs had similar claims to the first three. Sepulvida claims that he was not promoted within the DAC organization because of his Mexican-American origin. In similar manner, Arredondo claims that his Mexican heritage illegally caused his not being hired at all by the DAC.

The goals and purposes Congress emphasized in the Economic Opportunity Act of 1964 when looked at in light of the claims made by the plaintiff herein introduce another paradoxical aspect to this lawsuit. From the statutory purpose provisions, it is clearly obvious that

the DAC was created expressly to help or enhance the lives of Dallas' economically disadvantaged citizens, a target group which poignantly contains vast numbers representing minority cultures and races. Yet the lawsuit alleges that in spite of these laudatory purposes expressed in the statutes, the DAC nevertheless operates in such a way as to openly discriminate against the Dallas Mexican-Americans.

Because the DAC is an entity with only limited resources aimed at fighting social problems of almost unlimited dimensions, struggles among the various poverty groups—racial, ethnic, religious and political—which comprise the municipality's poor population exist. Naturally, the manner of distributing the scarce resources through programs administered by DAC officials is open to criticism. One apparent criticism has been the lack of exactness used by the DAC in its efforts of distribution. Minority groups' jealousies of their position relative to other minority recipients and their suspicions of the motivations of other needy groups give rise to much of the aforementioned criticism. In addition, those jealousies and suspicions cast political overtones to everything that DAC does. Not doubt, many Mexican-Americans held these feelings toward Dallas' Black population since the Black population's larger absolute size and larger amount of impoverished members gave it an inherent claim to more services and jobs offered by the Economic Opportunity Act in general and DAC, in particular. The Court believes that the Mexican-American's concern over the amount of control the Dallas Black population had over DAC operations compounded the alleged legal reasons for this lawsuit.

Apparently, legitimate concern over their vested interests in the DAC poverty-oriented programs as well as the political implications of such a suit, caused the individual plaintiffs to expand their own claims to include class-wide treatment of Mexican-Americans as a group.

The appropriate definition of the class sought to be represented by the individual plaintiffs became subject of much debate during the early stages of the suit, especially as intervenors joined the plaintiff's list. The Court ruled under F.R.Civ.P. 23(b) that the complaint alleged in fact two subclasses: The first, designated as "class one" for purposes of this litigation, was defined to include:

> All past and present Mexican-American employees, agents, representatives of defendant including but not limited to all past and present Spanish surnamed employees, agents and representatives.

The second, designated as "class two", was aimed at the allegation that because of DAC's discriminatory conduct, poor Mexican-Americans in Dallas neither received nor had available to them the services, projects, and job opportunities offered city-wide to the rest of the disadvantaged. It included:

> All Mexican-American residents of the County of Dallas, Texas, including but not limited to all Spanish surnamed Americans residing in Dallas County, Texas, or who have resided in Dallas County, Texas, during any period from October, 1965, the date upon which defendant began its operations in Dallas County, Texas, until the present time.

After acknowledging the peculiarities of this case and realizing the importance its outcome has upon the usually forgotten, misplaced, and ill-treated of the City of Dallas, one nevertheless comes down to two crucial issues at hand. Insofar as the individual plaintiffs are concerned, did the DAC, its employees, and supervisory personnel discriminate against the plaintiffs by failing to hire them, promote them, or illegally fire them on the basis of their national origin? Insofar as the "class two" Mexican-American residents of Dallas County are concerned, did the DAC, its employees, and supervisory personnel discriminate against them by not making

available on an equal basis its services and related programs? The facts introduced at trial provide a negative answer to the first question. As for the second, the answer is also no. The individual claims and the class claims will be treated in that order.

## I. *Individuals*

### A. Santos Badillo

Mr. Badillo applied for and was accepted by DAC for employment as a job development specialist in the Manpower segment of the defendant's operations. He started his $7,500 a year job on May 11, 1970, under the immediate supervision of Mrs. Edna Morrison, a Caucasian. Within a few weeks after his starting, Mrs. Morrison became aware of Mr. Badillo's spending work time in the office of the Field Director of Manpower Teams trying to find documents to substantiate his personal theory that Manpower and other DAC projects were discriminating against Mexican-Americans. Mrs. Morrison conferred with her superior and then issued a written reprimand to Mr. Badillo on June 11, 1970, advising, among other things, that he was not to proceed with his personal interests while on DAC time. The plaintiff remained undaunted and continued his investigatory work until Mrs. Morrison again found his work effort lacking. As a probationary employee—one who has three months within which to show his desire and ability for a given job with DAC—Badillo failed to meet the standard and was therefore fired on July 17, 1970.

Mrs. Morrison stated that the reason for his firing was "for cause" in that Mr. Badillo showed "poor judgment" in several instances, in that he disregarded his supervisors' directions, failed to follow normal procedures and instructions relating to the expected eight-hour work day, and lacked the correct attitude or loyalty toward the agency itself.

The reasons in support of Mrs. Morrison's firing Badillo were developed in numerous investigatory reports performed by the Office of Economic Opportunity and the Equal Employment Opportunity Commission in response to the plaintiff's charge that the DAC discriminated against him.

Most of the factual details in this regard were developed by the O.E.O. reports, especially that of Mr. Alexander Porter which concluded in a letter to the plaintiff that "no discrimination could be shown in this instance and the DCCAC was justified in terminating your employment." The three subsequent reports, completed by Baglio, Kent and Martinez, all relied upon Porter's initial investigation to an important extent, but reached different results.

Although the Martinez report officially represented the O.E.O.'s final conclusions, it differed completely from the Porter and Kent versions and significantly from the Baglio report when it stated that the "facts warranted a finding of probable cause to credit his complaint of discrimination." The different conclusions reached by the four reports indicate two things to the court. First, that individuals can independently reach different conclusions about the same subject. And, that Mr. Badillo's constant and repetitious requests for reviews of unfavorable O.E.O. reports demonstrated his persistence in trying to obtain one final report adopting his version of the termination. That final report did appear, completed by Samuel Martinez, Director of Region VI of the O.E.O., a one-time defendant in this case until the court dismissed the claims against him under the doctrine of sovereign immunity. Martinez' posture in the case together with the thoroughness of the Porter report lead this court to put more emphasis and faith in the conclusions reached in the latter. The court makes the same conclusions with respect to the 1972 E.E.O.C. report made by Gene Renslow which supported Badillo's position.

Importantly Badillo's own testimony at trial supports these conclusions. Al-

though being paid to perform an eight-hour day, Mr. Badillo testified that he only needed two hours to produce his quota of new job openings, and therefore only spent that much time on his job. The credibility of that statement was undermined when other evidence showed that the top "job development specialist" produced twice as many jobs as Badillo. Any bad faith on the DAC's part is also dispelled in the Court's mind when the record demonstrated that the DAC did not attempt to replace Mr. Badillo even though his position was not officially phased out.

▇ As was most recently stated by the Fifth Circuit Court of Appeals sitting *en banc,* Congress, in adopting the Civil Rights Act of 1964, sought only to "give all persons equal access to the job market, not to limit an employer's right to exercise his informed judgment as to how best to run his shop. Willingham v. Macon Telegraph Company, 5 Cir., 507 F.2d 1084, 1975. In a very clear sense, the DAC had the right and perhaps even the obligation to terminate Mr. Badillo for his failure to devote his time and energy, at least to the extent of an eight-hour day, to performing his job with the correct attitude toward his superiors and their rules without having the termination characterized as being prejudicially motivated. Mr. Badillo was adequately informed that his unauthorized studies performed during work time violated established DAC procedure.

After continuing in his own way, contrary to his supervisors' directives, the decision to terminate him became necessary. It was justified and was not discriminatory.

B. Robert Medrano

Mr. Robert Medrano, the second individual to enter this lawsuit on the plaintiffs' side, alleged that DAC's refusal in August, 1972, to promote him from his position of Neighborhood Service System's Director to the job of Deputy Director of Field Services, the second highest position in the DAC administration, was discriminatory on the basis of national origin.

Medrano's work record with the DAC has been an exemplary one, so much so that DAC still employs him in one of the most responsible positions in its hierarchy. Since his initial job with the DAC, in the Manpower component in 1968, Mr. Medrano had progressively occupied more and more responsible job positions until the summer of 1972 when he applied, along with approximately thirty other individuals, for the Deputy Directorship. Indeed, because of his upward movement through the DAC ranks from Manpower component employee, to Neighborhood Service Center Director, to Administrative Assistant to the Executive Director, had so closely paralleled that of Mr. Willis Johnson, a one-time Director of DAC, Mr. Medrano felt discriminated against by not receiving the promotion to Deputy Director.

When the Deputy Director position became vacant in 1972, Mr. Willis Johnson took steps to fill it in a thorough, reasonable and non-discriminatory manner. Initially, he named a screening committee on May 11, 1972, for the purpose of reviewing applications from a wide and varied number of places. Not only did it place advertisements for the position in the *Dallas Morning News, Times Herald, In-Sepia News* and *El Sol de Texas* (a Spanish-oriented newspaper) but, in addition, placed notifications in all the DAC facilities in Dallas, notified other community action agencies throughout the country and even contacted the Texas Employment Commission.

The committee adopted the recommendation of an Assistant Director of the O.E.O. by choosing to follow "OEO Guidance 6901–1, 'Guide to Selecting the CAA Executive Director,'" for the selection procedure to be used in filling the Deputy Director vacancy. Included in those guidelines was an interviewing process. Of the thirty some applicants, only the ten finalists were selected for

personal interviews by the screening committee. Out of those finalists, four were of Mexican-American origin.

The method by which the screening committee selected the ten finalists began by dividing the applications into five random groups. With the exception of the chairman, each committee member, separate from the other members, reviewed all groups of applications and selected what he or she considered were the two outstanding applicants in each group of five. Each committee member also rated the applications in order of preference. After tabulating the results of the ratings, the Chairman reviewed the resumés and then met with the committee to announce the finalist list and to discuss the desired objectives of the remaining selection steps.

Prior to the final interviews, the screening committee utilized OEO Guideline 6901–1 to formulate a standard set of questions in order to determine the qualifications of each remaining applicant with respect to the following criteria:

1. Goals, objectives, priorities
2. Program plans and budgets
3. Organization
4. Leadership ability and potential
5. Administrative capabilities, including depth and length of experience
6. Community support
7. Community change
8. Review and evaluation.

According to the suggested procedure contained in the OEO Guideline 6901–1, each member of the screening committee independently evaluated and awarded a numerical score with respect to the above selection criteria.

After totaling the scores of each applicant and arriving at the committee's preference list, the screening committee submitted it to Willis Johnson, Executive Director of DAC, who concurred with their conclusions that Lloyd Conley, the applicant from St. Louis, Missouri, was most qualified for the position. Of the top three finalists, Mr. Medrano finished third, with a score of 65.4. Mr. Conley scored a 77.6 and Mr. Henry Castillo, also of Mexican-American descent, finished second with a 69.4.

Mr. Medrano made many claims of fact that he hoped would support the conclusion that he was more qualified or equally as qualified as Mr. Conley. Although some of his stated facts bear relevance upon his seeking the Deputy Directorship, they by no means refute in this Court's mind the objective, reasonable conscientious job performed by the screening committee. It is true that Mr. Medrano had more work experience with the DAC, lived longer in Dallas, spoke two languages fluently, and had more contact with the Dallas poverty community. Nevertheless, Mr. Conley's appearance at trial assured the Court of his articulateness and leadership abilities. In view of Mr. Conley's impressive credentials, the Court finds the screening committee's decision to be well-founded.

█ In a hind-sight position as the present one, the Fifth Circuit in United States v. Jacksonville Terminal Company, 451 F.2d 418, 446 (1971), announced that in order for the Court to find that an individual was discriminated against that individual would necessarily have to present a prima facie case that the sought-after position was denied him, that it was available at the time of application, and that he was equally or more qualified than the ultimate recipient. Presented with that standard, the Court must conclude that Mr. Medrano's case is simply without merit.

C. Mrs. Andrea F. Cervantes

Mrs. Cervantes' claim arises out of her termination as a DAC Community House Aide on or about May 17, 1972, the subsequent explanations given for the occurrence, and the refusal of the DAC to hire her as an assistant director to a DAC summer program offered in 1972.

After hearing the evidence at trial, the Court concludes that Mrs. Cervantes lost her job due to the fact that a DAC budgeting move adopted in April, 1972, required the combination of the Community House component with the Neighborhood Services Program, thereby eliminating certain job categories, including those of Mrs. Cervantes and a Black peer of hers named Mrs. Butler. Placed in proper perspective, the real reason for Mrs. Cervantes' termination was not DAC discriminatory conduct but instead the simple misfortune of her having a job which ceased to exist. Although the immediate reason for her termination, as explained by her supervisor Mr. Medrano, was couched in terms of her lack of seniority, the real explanation, as pointed out above, was the natural consequence of an entity reorganizing itself. Any disparity in determining "seniority" between Mrs. Cervantes' case and other DAC employees at that time, is explained away as an inadvertent difference on the part of two different supervisors applying the same basic policy. This position is buttressed with evidence which showed that Allene Hardy, Willie Mae Butler, and Ruthie Ross—three Black Americans occupying positions with the Community House component —were also terminated within one month of Mrs. Cervantes. That fact coupled with the budgetary decision disproves any theory that Mrs. Cervantes' termination resulted from racial bias exhibited by her Black superiors toward herself and her fellow Mexican-Americans.

DAC's inadvertent or intentional bad faith with regard to Mrs. Cervantes is not involved here, as there was no evidence which showed that DAC retained "community house aide" positions after her dismissal and sought applications for the position. *See,* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Mrs. Cervantes also contends that the DAC discriminated against her in the way it reviewed the circumstances surrounding her termination. According to the Personnel Policies and Procedures Manual effective in May 1972, and immediately thereafter until July 15, 1972, when they were amended, Mrs. Cervantes and any other aggrieved employee of DAC could request a review of their grievance. In Mrs. Cervantes' case, she requested and received an explanation from her supervisor, Mr. Medrano, for her termination. After having such a conference, an employee still dissatisfied with his or her situation was entitled to request a three-man grievance committee to review the matter within five days thereafter.

Not until December 8, 1972, some five months after her conference with Mr. Medrano, did Mrs. Cervantes contest or object in any way his explanation for her termination. At that time, she asked for further grievance proceedings. The Court finds that Mrs. Cervantes received all the necessary attention, explanation, and other procedures required of the DAC. Furthermore, no discrimination resulted against her in this regard.

■ Mrs. Cervantes' claims were compounded in and about the spring and summer of 1972 when the DAC allegedly discriminated against her by refusing to hire her as an assistant director for the 1972 Summer Program. Although Mrs. Cervantes did have some previous experience with a somewhat related summer program conducted by the Target Area Coordinating Council (TACC), this fact and the other evidence introduced at trial proved insufficient to establish that Mrs. Cervantes was equal to or superior to the men hired to head up the DAC 1972 Summer Program, as is required by the *Jacksonville Paper* standard. The evidence surrounding the ultimate selection of Mr. Victor Bonillo as the Assistant Director of defendant's 1972 Summer Program was incomplete and therefore proved inconsequential insofar as Cervantes' proposed theory attempted to tie his appointment with the discrimination against herself and other Mexican-Americans. Accordingly, the

Court holds in favor of the defendant as to Mrs. Cervantes' claims.

### D. Luis Sepulvida

■ Luis Sepulvida is a Spanish-surnamed Mexican-American male who was hired as a Youth Developer in the DAC Youth Development Program on or about March 3, 1972. Mr. Sepulvida basically claims that the DAC twice did not promote him to more advanced jobs because of national origin.

The first time came in the fall of 1972, when both he and Beverly Williams, a Black female, applied for promotion to the position of Senior Program Developer. Mrs. Williams had received the assignment to the Temporary Senior Program Developer position on July 21, 1972, and eventually secured the permanent title, over Mr. Sepulvida, on October 31, 1972. Mrs. Williams' accelerated progress within the DAC organization was due in part to her having received an East Texas State University Bachelor of Arts degree in psychology and sociology, two subject areas of great applicability and importance to DAC's programs. In contrast to Mrs. Williams' learning and skill is the fact that Mr. Sepulvida had only graduated from high school at that time. The Court finds that the evidence and courtroom appearances demonstrated by a preponderance of the evidence that Mrs. Williams was selected ahead of Mr. Sepulvida for the position of Senior Program Developer because she was obviously more qualified, and not because of any ethnic reason. *See, Jacksonville Paper Co., supra.*

Mr. Sepulvida's second occasion to not be promoted came last March, 1974, when Ms. Mary Baines was selected for the position of Technical Assistant/Training Specialist ahead of the plaintiff and another man named Ed Luther. The Court reaches the same conclusion here as it did with regard to Mrs. Willliams. Because of prior business experience working for General Telephone Company and having attended Bishop College and Draughon's Business College, the latter of which she graduated from in 1971, Ms. Baines was more qualified than the plaintiff.

The evidence also demonstrates that Mr. Sepulvida's personal interviews demonstrated a lack of knowledge in the area of adult learning theory, a skill necessary for the position of Technical Assistant/Training Specialist. Additionally, the evidence showed that just last fall, Mr. Sepulvida received assignment to the position of Youth Counselor/Coordinator within one of DAC's Youth Programs at a starting salary $2,000 in excess of either of the positions formerly sought by him. In conclusion, the Court holds for the defendant DAC insofar as Mr. Sepulvida's claims are concerned.

### E. Robert Arredondo

Mr. Arredondo claims that the DAC's ultimate decision not to hire him for the position of a Neighborhood Organizer in January, 1968, as decided and announced to him by the DAC Executive Director Robert Maley, was discriminatory on the basis of national origin.

Mr. Arredondo filed his Charge of Discrimination with the Equal Employment Opportunity Commission on February 9, 1968, received a notice of his right to sue from the E.E.O.C. on December 4, 1972, but chose not to intervene in this lawsuit until June 27, 1973, approximately eight months later.

The Court finds that insofar as Mr. Arredondo's claims under the 1866 Civil Rights Act (42 U.S.C. § 1981) and the 1964 Civil Rights Act (42 U.S.C. § 2000e) are concerned, appropriate statute of limitations bar his cause of action, and alternatively, that the evidence produced at trial adequately demonstrated that Mr. Maley decided not to hire the plaintiff on the basis of sound administrative judgment, and not on the basis of his national origin.

■ Since the pertinent provisions of the 1866 Civil Rights Act, including § 1981, prescribe no period of limitations,

the Federal Courts generally regard the most analogous state period of limitations as controlling. Griffin v. Pacific Maritime Assoc., 478 F.2d 1118 (9th Cir. 1973), cert. den. 414 U.S. 859, 49 S. Ct. 69, 38 L.Ed.2d 109; Johnson v. Railway Express Agency, Inc., 489 F.2d 525 (6th Cir. 1973), reh. den. 1974.

■ ■ Because charges brought under Title VII of the 1964 Civil Rights Act are separate and independent from § 1981 ones, filing of discriminatory charges with the E.E.O.C., as Mr. Arredondo did in February, 1968, does not toll the applicable state limitations statute pertaining to § 1981 allegations. *See, Johnson, supra,* at 530. Accordingly, whether the § 1981 allegation herein is characterized as a tort or breach of contract under appropriate Texas limitations law matters not, since Mr. Arredondo's cause of action was barred by either limitation as it was not sued upon within four years of the alleged discriminatory act. Arredondo filed this suit more than five years after the alleged act. *See,* Tex.Jur.2d Limitations of Actions § 37, Vernon's Ann.Civil Statutes of Texas, Art. 5529, *also,* Marlow v. General Motors Company Fisher Body Division, 489 F.2d 1057 (6th Cir. 1973).

■ Since Mr. Arredondo chose not to file suit until approximately eight months after receipt of his right to sue letter from the E.E.O.C., he bypassed the ninety-day limitation period set forth in the letter and statute. Consequently, his claim under the 1964 Civil Rights Act is likewise barred.

■ After listening to the evidence produced at trial, the Court also finds that Mr. Maley's reasons for not hiring the plaintiff were reasonable, sound and not based upon prejudice. Because the plaintiff had been an active member in the Brown Berets, a militant Mexican-American organization, Mr. Maley believed that the plaintiff would be disloyal, unstable, malicious or capricious in the performance of his duties as a Neighborhood Organizer and that this

position, being a sensitive one, needed to be filled by someone other than Mr. Arredondo. Mr. Maley also knew of the plaintiff's prior termination from the position of Director of the Human Resources Development Corporation as a result of disagreements with superiors. This evidence draws the Court to conclude that Mr. Arredondo was refused employment with the DAC for good reasons.

## II. *Class aspects*

Although the Court has found in favor of the defendant DAC as to the individual plaintiffs' claims, the class itself may still prevail on its own merits under the doctrine of Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970). Primarily, the class contends that ever since the DAC's origin in 1965, its programs, facilities, and employment opportunities have not been advertised, or otherwise extended to the Mexican-American segment of Dallas' population. The class contends that this is an inequitable and discriminatory manipulation of the program. Implicit in that assertion is the parallel contention that part of the Dallas Black population, because of its large numbers and consequential occupation of influential positions within the DAC organization, has discriminated against the plaintiff class in the above-mentioned ways. Due to the importance the DAC holds in the lives of many of Dallas' impoverished citizens, this lawsuit naturally takes on political overtones which requires a close scrutiny and analysis of the evidence presented at trial. Much of the plaintiffs' case consists of their reliance upon DAC statistics.

■ In many employer discrimination cases, racial statistics are used as a basis for allocating the burden of proof. Typically, the theory advanced is that a total absence or very nominal number of Blacks in the work force or some departmental level thereof constitutes a permissible basis for a jury or judge to infer that the employer has discriminated. In

some instances, that inference together with supporting facts and statistics will be strong enough to establish the plaintiff's prima facie case, thereby casting the burden upon the employer to disprove the inference with evidence either showing the lack of a discriminatory effort or showing a reasonable business necessity for such conduct. *See*, Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 270 (1971).

▓▓▓ The Fifth Circuit Court of Appeals has accepted the logic behind this standard, where a plaintiff initially demonstrates that a Caucasian-controlled employer has altogether failed to hire or promote Blacks or some other minority. *See*, Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (1974). The logical inference behind the legal shifting of the burden of proof also recognizes that an employer, for purposes of discrimination cases, intends the natural consequence of his acts. Thus, for example, if an employer, either intentionally or inadvertently, hires few or no minority members then the courts presume that he intends the natural consequence of his acts—i.e., employment discrimination. *See*, 42 U.S.C. 2000e et seq., Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972), Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

▓▓▓ From an examination of the Fifth Circuit opinions dealing with "discrimination statistics", one receives the impression that a plaintiff's ability to establish a prima facie case will usually depend upon other factors or evidence of an employer's discriminatory conduct in addition to statistical evidence. In most if not all cases where the burden of proof has shifted, "plus factors" of an employer's discriminatory policies—such as a biased seniority system or testing program—have been present.

In Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364–73 (5th Cir. 1974), the plus factor evidence took the form of a program of "discriminatory testing", improper use of "high school diploma as a requirement for hiring", and a "discriminatory seniority system". In *Rowe, supra*, the plus factor drew upon the employer's history of having had a lay-off and rehiring policy based upon prior experience with the defendant, which naturally worked to the discriminatory disadvantage of Black employees who had no such experience. That pattern and practice had carried over into the then present employment decision making process in a subtle, yet discriminatory nature.

In the United States v. Hayes International Corp. case, 456 F.2d 112, 119 (5th Cir. 1972), the defendant's inconsistent use of a referral service for all new employees turned out to be the additional factor besides statistical proof. And recently, in Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (1974), the Fifth Circuit pointed out that the "statistical pattern" of racial stratification between and within the defendant's departments by the derogation of Black employees into lower-paying jobs "[should be] *considered* in light of the past intentional discrimination and the illegal testing requirement". Coupled together, the statistics and the plus factors presented a "prima facie case of present effect of past discrimination in the company's promotion and transfer process".

The sum total of these cases brings this Court to conclude that it is indeed the rare lawsuit where a plaintiff's proffer of statistical evidence lone is consequential enough to establish a prima facie case of discrimination and thereby cause the burden to shift to the defendant. Although the Fifth Circuit has most recently said that statistical evidence alone is enough to establish a prima facie case, the *Rodriguez* case, *supra*, clearly differs from the instant one in that there, the Fifth Circuit was faced with "overpowering" statistics showing a "lily-white" hiring policy.

### A. Statistical Evidence

▓▓▓ The reasons for reviewing the effect statistical evidence has upon an

employer's discrimination suit are several-fold. First, of all the evidence produced at trial by the plaintiff, the Court fails to see any "plus factors" of discriminatory conduct, policies, or procedures exhibited by DAC toward Dallas' Mexican-American population. Under a reading of the above cases holding in favor of the statistical evidence creating a prima facie case, that conclusion would require an unequivocal or "overpowering" showing of statistical proof of discrimination in order for this Court to find that the plaintiff class had carried its burden of making a prima facie case. Although an analysis of the statistical evidence presented in this case offers some sticky problems, the Court nevertheless concludes that the plaintiff class' statistics proved altogether insufficient to establish either a prima facie case or actual discrimination on the part of the DAC toward the Mexican-Americans.

Both parties have introduced statistics running the gamut of the DAC's existence, from its creation in 1965 until the time of final argument in late 1974. Exactly what statistics are appropriate for the Court to consider in terms of accuracy, relevancy, and application to the DAC presents a problem of approach. That problem is confounded somewhat by the realization that several of E.O. A.'s original programs implemented locally into DAC's activities have been terminated or substantially modified by Congress since the filing of this lawsuit in January, 1973. The Manpower component of the DAC is one such diminished program, whose activity currently constitutes less than 2% of DAC's total program and whose lack of current funding and importance has caused elimination of the Dallas Manpower facility. In light of its overall holding against the plaintiffs, the Court does not attempt herein to determine what specific relief grounds have become mooted due to the recent Congressional resolutions.

As one would naturally expect, the plaintiffs and defendants disagree with the "proper" way to analyze or interpret the significance of the statistics offered into evidence. The Court is reminded at this point of a common maxim among politicians and accountants that a given set of statistics can be manipulated or presented to the observer in such a way as to prove almost any desired point. Although maxims by their general nature can seldom be trusted when applied to specific examples, this one provides sufficient forewarning in this case. The need to establish a correct interpretative approach is obvious, since the plaintiffs would have the Court take certain percentage ratios derived from analyzing characteristics of Dallas' population and request that they be exactly applied to the employment and service facilities offered by the DAC.

Specifically, the plaintiffs request the Court to use a "ratio" analysis, comparing the 1970 Census figures of the percentage of Blacks in the *total* Dallas population to the percentage of Spanish-surnamed or Spanish language speaking Americans (hereinafter Mexican-Americans) in the *total* Dallas population. They would then ask for that ratio to be correspondingly applied to all DAC activities. Since Black Americans represented 16.6% of the Dallas population in 1970 and Mexican-Americans only 6.7%, the plaintiff would argue that this 16.6%/6.7% or 2.5/1 ratio requires all DAC activities to hire or serve one Mexican-American for every two and one-half Black Americans so treated.

The defendants contest the general use of the "ratio approach", or alternatively suggest that it carries no relevance to the plaintiff's claims against the DAC unless the premises upon which it is based parallels or defines the same segment of the general population to whom the Economic Opportunity Act and the DAC are directed. Simply stated, the defendant argues that the statistical make-up of Dallas' population base is important only insofar as it pertains to that segment living at or below the "poverty level". Statistics based upon

the total Dallas population, including rich and poor alike, accordingly carry no significance since the E.O.A.'s whole statutory purpose focuses on helping the country's impoverished. That general observation applies principally to the second sub-class. It includes all those Mexican-Americans who have resided in Dallas County since October, 1965; but the only class members eligible to receive the benefits of DAC's many programs are "poverty level" individuals or families. As for the first sub-class, the general observation doesn't necessarily apply since Economic Opportunity Act does not require the DAC to employ only "poverty level" individuals. However, the poverty vs. total population distinction with regard to the sub-class' employment discrimination claims does not alter the Court's conclusions and analysis of the statistical evidence.

By using percentages and ratios of Black and Mexican-Americans living at or below the "poverty level indexes" established by the Federal Inter-Agency Committee, we arrive at a far different and more meaningful conclusion than that offered by the plaintiff. According to the 1970 Census figures, the total number of Black Americans living at or below the poverty threshold in Dallas County was 65,143, while the total population of Mexican-Americans living at the same level was 13,182. Taken as percentages of the total Dallas poverty level population these numbers respectively represented the following: Black Americans represented 46.8% of the Dallas poor while Mexican-Americans represented 9.0%. The ratio of poverty level Blacks to Mexican-Americans— 46.8%/9.0% = 5 to 1—contrasts quite significantly to the 2.5 to 1 result achieved by the plaintiffs' overly broad "total population" ratio analysis.

Although the Court concludes that the "poverty level" statistics more accurately portray the aims and functions of the DAC than those based upon the total Dallas population, it is nevertheless dissatisfied with the "ratio" approach generally. Within the unique factual context of this case, the Court believes that even a significant deviation in the statistical ratio, comparing Blacks to Mexican-Americans, would not necessarily prove discrimination against the plaintiff class. Instead of the "ratio" test, the Court believes that a better approach is the straight "percentage" test, where the given percentage of poverty level Mexican-Americans (9%) is used as a guideline for determining the appropriate percentages of Mexican-Americans which DAC should employ or serve.

This is true, in part, because this case involves more than one minority group. In the normal discrimination case, a simple ratio test naturally applies. A comparison between the number of whites employed versus the number of Blacks exists by which a court can determine if the employer's conduct produces discriminatory results. That comparison process is often expressed as a ratio of percentages. However, that type of test cannot achieve a correct representation of the facts in this case since the DAC employs and serves more than one minority group—Blacks, Mexican-Americans, Indians and even the whites. Of these four groups, no one of them represents a majority of Dallas' poor people. The Black population segment has the greatest percentage; yet with 45.6% that still constitutes only a plurality. Because of that fact, a comparison or ratio test using only Blacks and Mexican-Americans, without the others, would not prove discrimination against the Mexican-Americans.

This is true because, as long as the percentage of Mexican-Americans receiving DAC service and employment opportunities maintains an approximate correlation with its 9% of the Dallas poverty level population figures, the Court believes no statistical discrimina-

tion can be shown.[2] By analyzing the DAC statistics according to the "percentage" format, the Court finds that out of all the employment and service opportunities and programs offered by the DAC since 1965, the Mexican-Americans have received an average percentage equal to or greater than, in almost every period, their proportional 9% of the Dallas poverty level population.[3] From such a conclusion, it is clearly evi-

dent that no racially disparate treatment has resulted to the plaintiff class at the DAC.

A "ratio" test, using just Blacks and Mexican-Americans, can however convey the opposite and wrong impression. For instance, an E.O.A. report completed in March 1972 disclosed that from March 1, 1970, until February 28, 1971, the DAC Manpower component referred Black Americans for employment pur-

2. This conclusion applies to both sub-classes, even though the first sub-class deals with employment discrimination claims that involve both poor and non-poor Dallasites. The justification lies in the fact that the Mexican-Americans are not prejudiced in the number of employment opportunities which should or are made available to them in the DAC by the Court's analysis.

Under the Court's "poverty-level" analysis, the percentage of Mexican-Americans receiving employment opportunities in the DAC programs correlates with the 9% of Mexican-Americans in the Dallas County "poverty-level" base. A "total population" analysis would require the number of Mexican-American DAC opportunities to correlate with the 6.7% of Mexican-Americans in Dallas County's total population. As can be easily seen, no significant variation between the 6.7% and 9% figures exists. Indeed, if anything need be said it is that the Mexican-Americans are slightly favored with this analysis.

3. Examples of the plaintiffs' statistical exhibits illustrate no discrimination on DAC's part toward the Mexican-Americans.

A.) The Neighborhood Youth Corps projects, begun in 1970 for the purpose of enrolling disadvantaged youth 16 and 17 years old, who had left full-time school training, showed the following enrollment breakdown:

1. On July 29, 1970, after operating just two months, Mexican-Americans constituted 8% of the total, with Caucasians only 2%.

2. The N. Y. C. Summer Program had a 10% Mexican-American participation that year.

3. The N. Y. C. II reported a Mexican-American participation of 15.7% on March 20, 1972, along with a staff participation of 2 out of 20 or 10%.

4. The 1971 Summer NYC reported a 11.-8% participation of Mexican-Americans and also had a 10% staff involvement.

B.) The Headstart Programs also showed significant and fair participation percentages of Mexican-Americans:

1. On February 2, 1972, for example, Head Start enrollment included 20% of

Mexican-Americans, while its counterpart Health Start reported 18.6%.

2. The week in August 26, 1974 (Defendant's exhibit 42) showed a staff and children combined participation level of 26.2%. Out of 91 staff positions, Mexican-Americans occupied 10, for a 11% involvement.

C.) The plaintiffs also complained of an insufficient number of Mexican-Americans being employed in DAC staff or upper and middle management positions.

1. In January, 1972, an ethnic breakdown of the DAC component staffing patterns showed that of a total 404 positions, Mexican-Americans occupied 45 of a 11.1% participation level.

2. The same involvement level held true in February, 1973, where the plaintiffs' 35th exhibit showed that Mexican-Americans occupied 17% of the top management jobs, 7% of the middle management jobs and 11% of the para professional jobs—all for an average 11% total.

3. Although dipping somewhat in the topmost management positions category, those figures remained in a fairly constant proportion up through July 31, 1974.

D.) The plaintiffs introduced an "Affirmative Action Plan" adopted by the O. E. O. on January 5, 1973, for the DAC. It reported:

1. As of October, 1972, there was a "possible 1–4% point deviation in Spanish-surnamed employment", when measured against corresponding numbers in the total population, but that this DAC deviation was a *permissible* one.

2. As for top and mid-management positions, it reported that "Spanish-surnamed employment seems to be representative of that segment of the population."

3. It also concluded that the overall basic problem lay with DAC's hiring and servicing too many Blacks compared with white and Indian poverty groups. It asserted no such problem with regard to Mexican-American levels.

poses 85.3% of the total time, Mexican-Americans 11.9% of the total, Anglos (whites) 2.4%, and other groups .4% of the total. A ratio of these referral figures—85.3% (Black)/11.9% (M/A) = 7.5 to 1—illustrates a significant discrepancy from the 5 to 1 ratio that the Court arrived at earlier using the "poverty level" statistics, and an even greater disparity from the 2.5 to 1 ratio achieved from the plaintiff's suggested use of the "total" population statistics. Taken alone, we easily see how the Black to Mexican-American ratio approach, however defined, can indicate possible discrimination on the DAC's part. But, reference to the applicable percentages shows no discrimination. The 11.9% of job referrals enjoyed by the Mexican-Americans corresponds favorably with the 9% of Dallas' "poverty population" represented by the plaintiff class. Consequently, the Court finds that the straight percentage test provides a more accurate reflection of the DAC operations than either of the "ratio" tests; in addition, it finds that the plaintiff has demonstrated no racial disparity in the statistical evidence introduced. In so holding, the Court would indeed be remiss to order the DAC to hire, promote or serve a higher percentage of Mexican-Americans since an order of that kind would in effect require the DAC to discriminate against some other minority group in favor of the Mexican-Americans who already have their appropriate share of DAC benefits.

In summary, the Court finds that the plaintiff has failed to establish a prima facie case of discrimination through a statistical evidence presentation. The burden of proof therefore did not shift to the defendant.

B. *Other Evidence of Discrimination*

In addition to its discrimination claim based upon statistical evidence, the plaintiff class has also complained that the services provided by the DAC have been insufficiently advertised so as to attract and notify a proportionte number of Mexican-Americans. The Court also finds this claim to be without merit. The evidence points out that since 1970, three years before the filing of this lawsuit, the DAC printed one of its four employment promotional items in Spanish, announced job opportunities over several radio stations including KBUY, a Spanish speaking one, advertised opportunities in *El Sol*, a Spanish newspaper, as well as the two major Dallas daily newspapers. All these efforts show no discriminatory bias exhibited against the plaintiff class.

Part of the plaintiff's complaint in this subject area also claims that the location of all the DAC's twenty-two (22) Community Houses, with the exception of three in Spanish speaking areas, and the four (4) Community Centers are located in predominantly Black neighborhoods. Dallas County maps with color overlays depicting the density and location of Black and Mexican-American clusterings demonstrate no racial disparity on DAC's part. The Court finds that the location of the DAC facilities have been chosen for valid reasons.

The contention that an exorbitantly large number of DAC's inner city and outlying facilities are located in predominantly Black neighborhoods, although basically true on its face nevertheless fails to convey an accurate impression of the social make-up of the county. For one thing, several of the predominantly Black areas happen coincidentally to be the same location of higher density Mexican-American areas. Therefore, a service center, such as the one in West Dallas, may not only serve a predominate portion of Blacks, but in addition serve a similarly located, yet less dense neighborhood of Mexican-Americans. In light of the fact that Mexican-Americans constitute only 6.7% of Dallas' total population, the Court must also recognize that they are far more dispersed than the more numerous and more concentrated Black population. Instead of grouping together in one or two large areas, Mexican-Americans tend to form smaller neighborhood patterns often mea-

sured by several contiguous streets which are located within larger tracts having more concentrated mixtures of Blacks.

 Once again the Court finds no discrimination or discriminatory effect practiced upon the poverty level Mexican-Americans by the DAC and its plan of offering O.E.A. structured programs to them. The pragmatics of operating such an organization reinforce this conclusion. Due to the constant change in personnel, uncertainty in long range financing, and burden in administering the individual programs, the Court realizes that the DAC would do little, if any, good if its primary worry concerned meeting specific ratio tests in every detail of its operation so as to preclude every possibility of its operations appearing to some minority recipients as discriminatory.

The attorneys for the defendant are directed to prepare and submit the appropriate form of judgment to the Court.