Alan WILLINGHAM, Plaintiff-Appellant,

v.

MACON TELEGRAPH PUBLISHING COMPANY, Defendant-Appellee.

No. 72–2078.

United States Court of Appeals, Fifth Circuit.

Feb. 12, 1975.

---

Charles Marchman, Jr., Macon, Ga., Edward L. Baety, Field Atty., EEOC, Atlanta, Ga., for plaintiff-appellant.

James M. Simons, Austin, Tex., Charles L. Reischel, EEOC, Washington, D. C., Wayne S. Hyatt, Atlanta, Ga., amicus curiae, for Roger D. Gravette.

E. S. Sell, Jr., Macon, Ga., for defendant-appellee.

John Bacheller, Jr., Robert W. Ashmore, Atlanta, Ga., amicus curiae, for Rollins, Inc.

R. James George, Jr., Austin, Tex., amicus curiae, for Newspapers, Inc.

Before BROWN, Chief Judge, and TUTTLE, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Alan Willingham, plaintiff-appellant, applied for employment with defendant-appellee Macon Telegraph Publishing Co., Macon, Georgia (Macon Telegraph) as a display or copy layout artist on July 28, 1970.[1] Macon Telegraph refused to hire Willingham. The suit below alleged that the sole basis for refusal to hire was objection to the length of his hair. On July 30, 1970, he filed a complaint with the Equal Employment Opportunity Commission (E.E.O.C.), asserting discrimination by Macon in its hiring policy based on sex, and therefore in violation of Sec. 703(a), Civil Rights Act of 1964, Title 42, U.S.C., § 2000e–2(a).

The E.E.O.C. investigated the alleged discrimination and eventually advised Willingham that there was reasonable cause to believe that Macon Telegraph had violated the cited portion of the Civil Rights Act of 1964, and that he was entitled to file suit. On December 17, 1971, Willingham filed suit, alleging *in-*

---

1. There was evidence in the record that Willingham had made other applications for employment to Macon Telegraph, not all for the position of copy layout artist, but all of which were made prior to the application forming the basis for this lawsuit. For a more complete discussion see Willingham v. Macon Telegraph Pub. Co., 5 Cir. 1973, 482 F.2d 535, 539 n. 2, dissenting opinion of Simpson, Circuit Judge.

ter alia that Macon Telegraph's hiring policy unlawfully discriminated on the basis of sex. On April 17, 1972, the district court granted summary judgment in favor of defendant Macon Telegraph, finding no unlawful discrimination. Willingham v. Macon Telegraph Publishing Co., M.D.Ga.1972, 352 F.Supp. 1018. Upon Willingham's appeal from the district court decision a panel of this circuit. reversed, finding the presence of a prima facie case of sexual discrimination and directing remand for an evidentiary hearing Willingham v. Macon Telegraph Publishing Co., 5 Cir. 1973, 482 F.2d 535 (Simpson, Circuit Judge, dissenting). Upon en banc consideration we vacate the remand order of the original panel and affirm the district court.

## THE FACTS

The factual background of this case is set forth in the district court opinion and in the majority and dissenting opinion of the original panel. There is no substantial dispute between the parties as to the facts the more important of which we repeat here for convenience. Willingham was 22 years of age when he applied for work with Macon Telegraph in late July, 1970. Shortly before, during the Fourth of July holidays, an "International Pop Festival" was held at Byron, Georgia, a village about 15 miles from Macon. This event, attended by hundreds of thousands of young people, is described in footnote 3 to the dissenting opinion, 482 F.2d at 539:

> ■ The record shows that Macon community disapproval of long-haired males had been recently exacerbated by an "International Pop Festival" on July 3, 4, 5, 1970, at Byron, Georgia, a small community 15 miles from Macon. The crowds attracted to Byron were variously estimated at between 400,000 and 500,000 people. Bearded and long-haired youths and scantily dressed young women flooded the countryside. Use of drugs and marijuana was open. Complete nudity by both sexes, although not common was frequently observed. Of course the managing of-

ficials of the Macon Telegraph Publishing Company were peculiarly aware of community indignation over excesses during the Byron Pop Festival because of the wide publicity in its own daily newspaper. The appellee was entitled to consider that the business community of Macon, including its own advertisers, was particularly. sour on youthful long-haired males at the time of Willingham's application of July 28, 1970. It was a fair inference on the part of company officials that advertisers would share an attitude not significantly different from that of the community in general.

In short, Macon Telegraph's management believed that the entire business community it served-and depended upon for business success-associated long hair on men with the counter-culture types who gained extensive unfavorable national and local exposure at the time of the festival. Therefore the newspaper's employee grooming code, which required employees (male and female) who came into contact with the public to be neatly dressed and groomed in accordance with the standards customarily accepted in the business community, was interpreted to exclude the employing of men (but not women) with long hair. Willingham's longer than acceptable shoulder length hair was thus the grooming code violation upon which Macon Telegraph based its denial of employment.

Willingham's complaint to the E.E. O.C. and his federal suit were both grounded upon Sec. 703 of the Civil Rights Act of 1964, Title 42, U.S.C. § 2000e–2, which provides, in pertinent part, that:

> (a) It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .; or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to

deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . ..

Willingham's argument is that Macon Telegraph discriminates amongst employees based upon their sex, in that female employees can wear their hair any length they choose, while males must limit theirs to the length deemed acceptable by Macon Telegraph. He asserts therefore that he was denied employment because of his sex: were he a girl with identical length hair and comparable job qualifications, he (she) would have been employed. A majority of the original panel which heard the case agreed, and remanded the cause to the district court for a finding of whether or not the discrimination might not be lawful under the "bona fide occupational qualification" (B.F.O.Q.) statutory exception to Sec. 703.[2] Since we agree with the district court that Macon Telegraph's dress and grooming policy does not unlawfully discriminate on the basis of sex, the applicability of the B.F.O.Q. exception will not be considered in this opinion.

## THE NATURE OF SEXUAL DISCRIMINATION

■ The unlawfulness vel non of employer practices with respect to the hiring and treatment of employees in the private sector, as contemplated by Sec. 703 and applied to the facts of this case, can be determined by way of a three step analysis: (1) has there been some form of discrimination, i. e., different treatment of similarly situated individuals; (2) was the discrimination based on sex; and (3) if there has been sexual discrimination, is it within the purview of the bona fide occupational qualification (BFOQ) exception and thus lawful? We conclude that the undisputed discrimination practiced by Macon Telegraph[3] is based not upon sex, but rather upon grooming standards, and thus outside the proscription of Sec. 703. This determination pretermits any discussion of whether, if sexual discrimination were involved, it would be within the BFOQ exception.

■ Although our judicial inquiry necessarily focuses upon the proper statutory construction to be accorded Sec. 703, it is helpful first to define narrowly the precise issue to be considered. For two reasons, we have no question here of whether or not due process or equal protection standards need be applied. Firstly, there is no state action present giving rise to a constitutional question, and secondly, no claim of deprivation of a constitutional right is advanced. Cf. Karr v. Schmidt, 5 Cir. 1972, 460 F.2d 609 (en banc) with Lansdale v. Tyler Junior College, 5 Cir. 1972, 470 F.2d 659 (en banc) (grooming regulations within the public school systems and institutions of higher learning). Similarly, we are not concerned with discrimination based upon sex alone. That situation obtains when an employer refuses to hire, promote, or raise the wages of an individual solely because of sex, as, for instance, if Macon Telegraph had refused to hire any women for the job of copy layout artist because of their sex.

Willingham relies on a more subtle form of discrimination, one which courts and commentators have often character-

---

**2.** Congress provided that sexual discrimination would not be unlawful in a limited number of circumstances:

> Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, . . . on the basis of his . . . sex . . . in those certain instances where . . . sex, . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business

or enterprise, . . . Title VII Civil Rights Act of 1964 Sec. 703(e)(1), Title 42 U.S.C. § 2000e–2(e)(1).

**3.** There can be little doubt, and Macon Telegraph does not here dispute, that distinguishing between males with short hair and those with long hair is "discrimination" in some form as that term is used in Sec. 703. There is persuasive legislative evidence that the word "discriminate" is to be construed broadly under the Act. 110 Cong.Rec. 7213 (1964).

ized as "sex plus".[4] In general, this involves the classification of employees on the basis of sex *plus* one other ostensibly neutral characteristic. The practical effect of interpreting Sec. 703 to include this type of discrimination is to impose an equal protection gloss upon the statute, i. e. similarly situated individuals of either sex cannot be discriminated against vis à vis members of their own sex unless the same distinction is made with respect to those of the opposite sex. Such an interpretation may be necessary in order to counter some rather imaginative efforts by employers to circumvent Sec. 703.

■ Inclusion of "sex plus" discrimination within the proscription of Sec. 703 has legitimate legislative and judicial underpinning. An amendment which would have added the word "solely" to the bill, modifying "sex", was defeated on the floor in the House of Representatives. 110 Cong.Rec. 2728 (1964). Presumably, Congress foresaw the debilitating effect such a limitation might have upon the sex discrimination amendment. Further, the Supreme Court, in Phillips v. Martin Marietta Corp., 1971, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613, found expressly that "sex plus" discrimination violates the Civil Rights Act. The employer in *Phillips* refused to accept job applications from women with pre-school age children, but had no such policy with respect to male applicants. The defendant argued that it was not discriminating between men and women, but only amongst women, and then only with respect to a neutral fact—pre-school age children. In a short per curiam decision, the Supreme Court held that if the legislative purpose of giving persons of like qualifications equal employment opportunity irrespective of sex were to be effected, employers could not have one hiring policy for men and another for women. Thus "sex plus" discrimination against being a woman *plus* having pre-

school age children, was under the facts of that case just as unlawful as would have been discrimination based solely upon sex.

■ In this analytical context, then, the single issue in this case is precisely drawn: Does a particular grooming regulation applicable to men only constitute "sex plus" discrimination within the meaning of Sec. 703, as construed by the Supreme Court? Willingham and numerous amici curiae have advanced several arguments supporting an affirmative answer to the question. We proceed to consider these arguments.

The primary premise of Willingham's position is that "sex plus" must be read to intend to include "sex plus any sexual stereotype" and thus, since short hair is stereotypically male, requiring it of all male applicants violates Sec. 703. While the Supreme Court did not explicate the breadth of its rationale in *Phillips,* it seems likely that Mr. Justice Marshall at least might agree with Willingham. In his special concurrence he noted that any hiring distinction based upon stereotyped characterizations of the sexes violates the Act, and went on to say that such discrimination could never be a BFOQ exception, an issue expressly left open in the majority's per curiam opinion. Phillips v. Martin Marietta Corp., supra, 400 U.S. at 545, 91 S.Ct. at 498, 27 L.Ed.2d at 616.

Willingham finds further comfort in Sprogis v. United Air Lines, Inc., 7 Cir. 1971, 444 F.2d 1194. Plaintiff there was a female stewardess who challenged an airline rule that stewardesses were not allowed to marry, but with no such provision for male stewards or other employees. The *Sprogis* court found the rule to be an unlawful form of "sex plus" discrimination, relying in part on *Phillips.* In reference to "sex plus" the court noted that "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended

---

4. See, e. g., Note, Employer Dress and Appearance Codes and Title VII of the Civil Rights Act of 1964, 46 So.Cal.L.Rev. 965, 989–90 (1973); Note, Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L. Rev. 1109, 1171–72 (1971) (and cases cited therein).

to strike at the entire spectrum of disparate treatment of men and women *resulting from sex stereotypes.*" Sprogis v. United Air Lines, Inc., supra, 444 F.2d at 1198 (emphasis supplied). Treating the emphasized language in its broadest sense, it is possible that the court felt that all sexual stereotypes violate Sec. 703. Several district courts apparently agree with this construction, at least insofar as personal dress and appearance codes are concerned. See Aros v. McDonnell Douglas Corp., C.D.Cal.1972, 348 F.Supp. 661 (dress and grooming code constitutes sexual discrimination when applied differently to males and females); Donohue v. Shoe Corp. of America, C.D.Cal.1972, 337 F.Supp. 1357 (rule requiring short hair on men, but not on women, is prima facie violation of Sec. 703); Roberts v. General Mills, Inc., N.D.Ohio 1971, 337 F.Supp. 1055 (rule allowing female employees to wear hairnets, but requiring men to wear hats—and therefore keep their hair short—violates Sec. 703).

Finally, the E.E.O.C. by administrative decision, regulation, and on amicus brief here, fully supports Willingham's position. In its administrative decisions, the Commission has uniformly held that dress and grooming codes that distinguish between sexes are within Sec. 703, and can only be justified if proven to be a BFOQ. See Brief for Appellant (en banc) at 17–18. The Commission's regulations go a step further, assuming (we infer) that such codes are sexually discriminatory and asserting that "[t]he refusal to hire an individual based on stereotyped (sic) characterizations of the sexes" does not warrant the application of the BFOQ exception. Title 29 C.F.R. § 1604.2(a)(1)(ii) (1973). We are mindful also that "[t]he administrative interpretation of the Act by the enforcing agency is entitled to great deference," Griggs v. Duke Power Co., 1971, 401 U.S. 424, 434–435, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165.

## SEXUAL STEREOTYPES AND LEGISLATIVE INTENT

The beginning (and often the ending) point of statutory interpretation is an exploration of the legislative history of the Act in question. We must decide, if we can there find any basis for decision, whether Congress intended to include *all* sexual distinctions in its prohibition of discrimination (based solely on sex or on "sex plus"), or whether a line can legitimately be drawn beyond which employer conduct is no longer within reach of the statute.

We discover, as have other courts earlier considering the problem before us, that the meager legislative history regarding the addition of "sex" in Sec. 703(a) provides slim guidance for divining Congressional intent. The amendment adding "sex" was passed one day before the House of Representatives approved Title VII of the Civil Rights Act and nothing of import emerged from the limited floor discussion. Diaz v. Pan American World Airways, 5 Cir. 1971, 442 F.2d 385, 386. Ironically, the amendment was introduced by Representative Howard Smith of Virginia, who had opposed the Civil Rights Act, and was accused by some of wishing to sabotage its passage by his proposal of the "sex" amendment. Note, Employer Dress and Appearance Codes and Title VII of the Civil Rights Act of 1964, 46 So.Cal.L. Rev. 965, 968; Note, Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1167 (1971). And while it is argued that a lack of change in this section in the 1972 amendments to the Act evidences Congressional agreement with the position of the E.E.O.C., it may be argued with equal force that the law was insufficiently developed at the time the amendments were considered to support any change. We find the legislative history inconclusive at best and draw but one conclusion, and that by way of negative inference. Without more extensive consideration, Congress in all probability did not intend for its proscription of sexual discrimination to have significant and sweeping implications. We should not therefore extend the coverage of the Act to situations of questionable application without some stronger Congressional mandate.

We perceive the intent of Congress to have been the guarantee of equal job opportunity for males and females. Providing such opportunity is where the emphasis rightly lies. This is to say that the Act should reach any device or policy of an employer which serves to deny acquisition and retention of a job or promotion in a job to an individual *because* the individual is either male or female. The language of the Supreme Court in *Griggs* regarding racial discrimination applies with equal (but not greater) force to sexual discrimination: "The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." Griggs v. Duke Power Co., supra, 401 U.S. at 429–430, 91 S.Ct. at 853, 28 L.Ed.2d at 163. We expressed this thought in *Diaz*: "[I]t is reasonable to assume, from a reading of the statute itself, that one of Congress' main goals was to provide equal access to the job market for both men and women." Diaz v. Pan American World Airways, supra, 442 F.2d at 386. Indeed, the Supreme Court made the same point in *Phillips* by saying that "Section 703(a) of the Civil Rights Act of 1964 requires that persons of like qualifications be given employment opportunities irrespective of their sex." Phillips v. Martin Marietta Corp., supra, 400 U.S. at 544, 91 S.Ct. at 497–498, 27 L.Ed.2d at 615.

Juxtaposing our view of the Congressional purpose with the statutory interpretations advanced by the parties to this action elucidates our reasons for adopting the more narrow construction. Equal employment *opportunity* may be secured only when employers are barred from discriminating against employees on the basis of immutable characteristics, such as race and national origin. Similarly, an employer cannot have one hiring policy for men and another for women *if* the distinction is based on some fundamental right. But a hiring policy that distinguishes on some other ground, such as grooming codes or length of hair, is related more closely to the employer's choice of how to run his business than to equality of employment opportunity. In *Phillips,* supra, the Supreme Court condemned a hiring distinction based on having pre-school age children, an existing condition not subject to change. In Sprogis v. United Air Lines, supra, the Seventh Circuit reached a similar result with respect to marital status. We have no difficulty with the result reached in those cases; but nevertheless perceive that a line must be drawn between distinctions grounded on such fundamental rights as the right to have children or to marry and those interfering with the manner in which an employer exercises his judgment as to the way to operate a business. Hair length is not immutable and in the situation of employer vis à vis employee enjoys no constitutional protection. If the employee objects to the grooming code he has the right to reject it by looking elsewhere for employment, or alternatively he may choose to subordinate his preference by accepting the code along with the job.

We agree with the District of Columbia Circuit's treatment of this problem. Dodge v. Giant Food, Inc., D.C.Cir. 1973, 488 F.2d 1333, following that court's earlier decision in Fagan v. National Cash Register Co., 1973, 157 U.S.App.D.C. 15, 481 F.2d 1115. In *Fagan,* the plaintiff employee was discharged for refusal to comply with a company grooming rule because of his long hair, and sued under Sec. 703(a). Dismissal of his suit was affirmed, on the ground that hair length is not constitutionally or statutorily protected, and hence its regulation as to men but not women designed to further the employer's legitimate business interest, is not sexual discrimination. Fagan v. National Cash Register Co., supra, 481 F.2d at 1125. Enlarging upon this principle, the court held in *Dodge* that hair length regulations "are classifications by sex . . . which do not represent any attempt by the employer to prevent the employment of a particular sex, and which do not pose distinct employment

disadvantages for one sex. Neither sex is elevated by these regulations to an appreciably higher occupational level than the other. We conclude that Title VII never was intended to encompass sexual classifications having only an insignificant effect on employment opportunities." Dodge v. Giant Food, Inc., supra, 488 F.2d at 1337.

We adopt the view, therefore, that distinctions in employment practices between men and women on the basis of something other than immutable or protected characteristics do not inhibit employment *opportunity* in violation of Sec. 703(a). Congress sought only to give all persons equal access to the job market, not to limit an employer's right to exercise his informed judgment as to how best to run his shop.

We are in accord also with the alternative ground mentioned in both the District of Columbia Circuit cases and relied upon by Judge Bootle in his memorandum decision in *Willingham*: "From all that appears, equal job opportunities are available to both sexes. It does not appear that defendant fails to impose grooming standards for female employees; thus in this respect each sex is treated equally." Willingham v. Macon Telegraph Publishing Co., supra, 352 F.Supp. at 1020. See also Dodge v. Giant Food Co., supra, 488 F.2d at 1336, Fagan v. National Cash Register Co., supra, 481 F.2d at 1124 n. 20; Boyce v. Safeway Stores, D.D.C.1972, 351 F.Supp. 402, 404. This *frame* of analysis removes Willingham's complaint completely from the Sec. 703(a) "sex plus" category, because both sexes are being screened with respect to a neutral fact, i. e., grooming in accordance with generally accepted community standards of dress and appearance. Since Macon Telegraph applies this criterion to male and female applicants (see the original record at 17, Response of Defendant to Plaintiff's Request for Admissions), the equal protection gloss has no applicability.

We are as persuaded by the arguments of Macon Telegraph and its *amici* supporters as we are unpersuaded by those of Willingham. Support for the latter lies in the concurring opinion of Mr. Justice Marshall in *Phillips,* supra. With deference, his views appear to be his alone. The fact that he separately concurred without being joined by any other justice is a fair indication that he speaks there only for himself. And while *Griggs* teaches that agency interpretation is due "great deference", we, as did the District of Columbia Circuit in *Fagan,* note the equally significant qualifying explanatory statement: "Since the Act and its legislative history support the Commission's construction, *this affords good reason* to treat the guidelines as expressing the will of Congress." (Emphasis added). Fagan v. National Cash Register Co., supra, 481 F.2d at 1125, quoting Griggs v. Duke Power Co., supra, 401 U.S. at 434, 91 S.Ct. at 855, 28 L.Ed.2d at 165–166. The language of the statute as to the issue before us is anything but clear. Indeed, judicial construction was required simply to reach the abstract principle of "sex plus"; and the legislative history supports, if anything, the wisdom of narrow construction. Finally, we are in accord with the result reached in Sprogis v. United Air Lines, supra, and with much of its dicta, particularly that regarding stereotypes, but only insofar as it is intended to embrace distinctions touching immutable characteristics or protected rights.

## CONCLUSION

Nothing that we say should be construed as disparagement of what many feel to be a highly laudable goal— maximizing individual freedom by eliminating sexual stereotypes. We hold simply that such an objective may not be read into the Civil Rights Act of 1964 without further Congressional action. Private employers are prohibited from using different hiring policies for men and women only when the distinctions used relate to immutable characteristics or legally protected rights. While of course not impervious to judicial scrutiny, even those distinctions do not violate

Sec. 703(a) if they are applied to both sexes.

Affirmed.

WISDOM, Circuit Judge, joined by TUTTLE, GOLDBERG and GODBOLD, Circuit Judges, dissenting.

I dissent for the reasons stated in the original opinion of the panel. Willingham v. Macon Telegraph Publishing Co., 5 Cir. 1973, 482 F.2d 535.