Bennie E. SMITH, on behalf of himself & other persons similarly situated, Plaintiffs-Appellants,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellee.

No. 75–3230.

United States Court of Appeals, Fifth Circuit.

March 13, 1978.

E. Lundy Baety, Atlanta, Ga., for plaintiffs-appellants.

Melbourne D. McLendon, Atlanta, Ga., Kalvin M. Grove, Chicago, Ill., Robert A. Penney, Boston, Mass., for defendant-appellee.

Before BROWN, Chief Judge, COLEMAN and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal challenges the District Court's ruling dismissing claims of race and sex discrimination brought under Title VII, 42 U.S.C.A. § 2000e *et seq.* Finding the ruling to be correct, we affirm.

Bennie E. Smith, a black male, filed an application for employment with Liberty Mutual Insurance Co. on February 11, 1969, for an "administrative (general)" position as a mail room clerk. He was interviewed by Liberty Mutual's personnel manager and by the mail room supervisor, Nathaniel Nash. Nash, a black male, did not recommend that the company hire Smith because, in Nash's opinion, Smith was effeminate. Smith's application for employment was rejected. Thereafter, a charge of discrimination was filed with the Equal Employment Opportunity Commission alleging refusal to hire on the basis of race and in a subsequent amendment on the basis of sex.

After exhausting EEOC procedures, Smith filed a class action suit in District Court. During the course of the proceedings, Smith moved for summary judgment on the sex discrimination claim and Liberty Mutual moved for dismissal. Treating the two as cross-motions for summary judgment, the District Court in an interlocutory order on June 3, 1975, 395 F.Supp. 1098, granted summary judgment in favor of Liberty Mutual on the sex discrimination claim and ordered the case to proceed on the race discrimination issue. During the trial, at which, oddly enough, Smith deliberately did not appear in person, the Court, after hearing one adverse witness and receiving documentary evidence, sustained Liberty Mutual's motion to dismiss. By final judgment, entered on July 31, 1975, all remaining claims were disposed of by dismissing Smith's suit. This appeal followed.

In addition to appealing the dismissal of the race and sex claims of discrimination, Smith challenges several interlocutory orders that were entered along the way, including (i) the order of December 4, 1973, denying a motion to amend the complaint to include punitive damages, and (ii) the order of March 4, 1974, disallowing the action to be maintained as a class action and denying a motion relating to discovery.

### Sex Discrimination Claim

Liberty Mutual concedes that Smith's application for employment was rejected because the interviewer considered Smith effeminate. Smith argues that the law forbids an employer to reject a job applicant based on his or her affectional or sexual preference.

In considering this claim, the District Court held that the Civil Rights Act does not forbid discrimination based on affectional or sexual preference. In *Willingham v. Macon Telegraph Publishing Co.*, 5 Cir., 1975, 507 F.2d 1084 (en banc), the employment application of Willingham, a young 22-year-old male, was rejected because of his hair length. Sex discrimination arose, so he claimed, because females could, and most did, wear their hair as long or longer. This Court en banc considered "whether Congress intended to include *all* sexual distinctions in its prohibition of discrimination (based solely on sex or on 'sex plus') or whether a line can legitimately be drawn beyond which employer conduct is no longer within the reach of the statute." *Id.* at 1090.

An examination of legislative history in *Willingham* led us to the concrete

conclusion that Congress by its proscription of sex discrimination intended only to guarantee equal job opportunities for males and females. Thus, we held that the prohibition on sexual discrimination could not be "extend[ed] . . . to situations of questionable application without some stronger Congressional mandate." *Id.*

Here the claim is not that Smith was discriminated against because he was a male, but because as a male, he was thought to have those attributes more generally characteristic of females and epitomized in the descriptive "effeminate". Indeed, as we shall see in assaying Smith's attack on the class action ruling, in the middle of the trial he raised for the first time that the employer discriminated against him, not because he was too womanly, but because he simply was a male and females were given preference.

■ We adhere to the conclusion of *Willingham*[1] and hold that Title VII cannot be strained to reach the conduct complained of here.

### Race Discrimination Claim

■ The District Court dismissed the claim of racial discrimination at the conclusion of Smith's evidence and held a prima facie case had not been made. *McDonnell Douglas Corp. v. Green*, 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, establishes the burden that must be carried by a complainant in proving a prima facie case of racial discrimination. The Supreme Court held that the burden is met if the complainant shows that: (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after the rejection, the position remained open and the employer continued to seek applicants. *Id.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–78.

Smith proved that he belonged to a protected minority, applied for the job, was qualified,[2] was rejected, and that other applicants were sought.[3] The District Court, nevertheless, held that a prima facie case was not established. Although we disagree with the stated justification for its actions, the District Court's holding does not forbid our affirmance of the ultimate holding of no racial discrimination.

This case comes squarely within the rule of *Peters v. Jefferson Chemical Co.*, 5 Cir., 1975, 516 F.2d 447:

> Q And I believe the mail room supervisor who had interviewed Mr. Smith was Mr. Nash, was he not?
> A That's correct.
> Q Did Mr. Nash indicate to you whether or not Mr. Smith had the qualifications for the job?
> A Yes.
> Q What was his indication?
> A Well, he said that if anything, he was over qualified for it.
> Q If anything, he was over qualified?
> A That was his opinion, yes, sir.
> R., vol. 3, at 43–44.

1. Our position in *Willingham* has been adopted by the Second, Fourth, and Eighth Circuits. *Longo v. Carlisle De Coppet & Co.*, 2 Cir., 1976, 537 F.2d 685; *Earwood v. Continental Southeastern Lines, Inc.*, 4 Cir., 1976, 539 F.2d 1349; *Knott v. Missouri Pacific R.R. Co.*, 8 Cir., 1975, 527 F.2d 1249. *Cf. General Electric Co. v. Gilbert*, 1976, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (disability plan that excluded pregnancy did not discriminate in regard to sex); *Stroud v. Delta Air Lines, Inc.*, 5 Cir., 1977, 544 F.2d 892 (where only women held positions as flight attendants, no marriage rule of employer did not discriminate in regard to sex).
   The EEOC itself has ruled that adverse action against homosexuals is not cognizable under Title VII. EEOC Dec. 76–75, CCH Emp.Prac. ¶ 6495 (1976); EEOC Dec. 76–67 (1975) (unpublished). Two district courts also have held that Title VII does not protect transsexuals. *Powell v. Read's Inc.*, D.Md., 1977, 436 F.Supp. 369; *Voyles v. Ralph K. Davies Medical Center*, N.D.Cal., 1975, 403 F.Supp. 456.

2. In questioning Weldon Cole, Administrative Manager of the Southern Division of Liberty Mutual, the following exchange occurred:

3. The questioning of Cole continued:
   > Q All right. Who made the decision that Mr. Smith wouldn't be employed?
   > A Mr. Nash.
   > Q After that decision was made, do you know whether or not you continued to look for someone to fill the position?
   > A Yes, we did.
   > R., vol. 3, at 46.

The legal effect of ·recognizing that a prima facie case had been proven by the plaintiff would have been to shift the burden to the defendant to come forward with evidence that a legitimate nondiscriminatory reason existed for its non-transfer and termination actions. *See McDonnell Douglas Corp. v. Green, supra.* Since the court's opinion makes it clear that the full merits of Ms. Peters' proof and the company's defense were considered in reaching the conclusion that Ms. Peters was not the victim of employment discrimination based on her sex, if there was error in classifying her proof as less than sufficient to cross the prima facie threshold, it was harmless. The district court did not stop its analysis of the proof with its conclusion that Ms. Peters had failed to meet her prima facie burden. The rule is that "[o]nce the plaintiff has made out his prima facie case we look to the defendant for an explanation since he is in a position to know whether he failed to hire a person for reasons which would exonerate him." *Hodgson v. First Federal Savings and Loan Association,* 455 F.2d 818, 822 (5th Cir. 1972). This is precisely what the court did. It found that Jefferson had established legitimate non-discriminatory reasons for its actions regarding Ms. Peters. There is more than adequate support for the conclusion that Jefferson had legitimate reasons for its actions with regard to Ms. Peters. *Id.* at 450. The record is replete with the Court's efforts to achieve an understandable idea of just what Smith was claiming as the reason for his not being hired.[4] Indeed, those efforts comprise nearly the whole record. Here, the Court did not end its analysis with the simple conclusion that Smith did not meet his prima facie burden. The Court went further in exploring the reason for the denial. Smith's own case established that Liberty Mutual failed to hire him because he was classified as effeminate by the company interviewer.[5] This reason is uncontradicted and one which, we have held above, is not forbidden by Title VII. Liberty Mutual sufficiently satisfied the *McDonnell* burden of response.

4.   THE COURT: Well, here is what's running through my mind, the reason I asked that, and I don't want to ask blind questions. In this case is it not that the plaintiff has shown more than the failure of the company to hire a qualified applicant, the plaintiff has gone on to show the reason why the company failed to hire him, and that that was that the company's interviewer found him to be effeminate. I don't find any suggestion in the statistics or other things of another reason, particularly not another reason that is forbidden by law.

*   *   *   *   *   *

THE COURT: For what it may be worth, the only evidence or reason I think in the case so far is this Miss Jean Levine's report to the Regional Director, which plaintiff put in and I have admitted over objection. The reason there is that this man was not turned down for race, but that he was denied employment for effeminate characteristics, and there has not been a scintilla of evidence to the contrary.

*   *   *   *   *   *

THE COURT: But I'm talking about this particular man's experience out there applying for a job, where he was frustrated and didn't get the job.

Also, I think in the Supreme Court case, when they say a man is qualified, that means qualified in all respects for the job. I, too, believe that a person who is a Master of Philosophy would be "overqualified", that is unqualified to take a relatively menial job with any expectation that he would be a satisfactory employee, that morale would be high, and that he would be able to give his best efforts to the clerking of mail, whatever mail clerks do. The word "overqualified" I don't think means superqualified. I think it means that he is relatively unqualified for this job.

But, be that as it may, I don't think that is why, according to the evidence, I don't think according to the evidence adduced in the case that is why he wasn't employed. He wasn't employed because the interviewer didn't like this particular person, white, black, male or female, he just didn't like him because he was, in his view, gave evidence of the characteristics of sexual aberration.

R., vol. 3, at 78–80.

5.   During the trial, Cole explained why Nash did not recommend Smith:

Well, I know what he told me when I discussed it with him when I got the notice from the EEOC. He said that there was no question the man was qualified for the particular position that was open at the time, but that frankly he thought he was effeminate.

R., vol. 3, at 46.

Smith claims the statistics proved discrimination in hiring blacks by Liberty Mutual. This Court has always recognized the strong probative value of statistics in proving race discrimination cases. *See Pettway v. American Cast Iron Pipe Co.*, 5 Cir., 1974, 494 F.2d 211; *Rowe v. General Motors Corp.*, 5 Cir., 1972, 457 F.2d 348; *Brooks v. Beto*, 5 Cir., 1966, 366 F.2d 1, *cert. denied*, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135; *Alabama v. United States*, 5 Cir., 1962, 304 F.2d 583, *aff'd per curiam*, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112. In the recent case of *International Brotherhood of Teamsters v. United States*, 1977, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, the Supreme Court again praised the application of statistics in employment discrimination cases: "We have repeatedly approved the use of statistical proof . . . to establish a prima facie case of racial discrimination in jury selection cases . . . Statistics are equally competent in proving employment discrimination." *Id.*, 431 U.S. at 339, 97 S.Ct. at 1856, 52 L.Ed.2d at 417–18.

In the Office and Clerical Department of Liberty Mutual, statistics show that 5.8% of the total employees in 1966 were black. In 1974, however, blacks represented 66.9% of the clerical employees. These statistics, standing alone as they did, fail to establish discriminatory hiring in this department. On the contrary, they show an employer, conscious of its legal duty not to discriminate, instituting and following practices which, oddly enough for a Title VII case, show the pendulum swinging in the opposite direction. Insofar as the belated theory that males, black or white, were discriminated against by the apparent preferential hiring of females is concerned, Smith offered no evidence apart from skeletal statistics to show that any males had ever applied or had been turned down in preference to women for these clerical office positions. The trial court had ample basis, following correct principles, for refusing to find that Smith was denied employment for racially discriminatory reasons.

The other claimed errors may be swiftly dealt with. The refusal to permit an amendment to claim punitive damages washes out now as moot.[6] As to overly restrictive limitation in discovery to only clerical positions, the record shows that, with infinite patience reflected to the very end, the Judge urged Smith's counsel to point out specifically which of the interrogatories were not adequately answered so that the Court could make a rational selective judgment. This was never done. In the light of this failure, we cannot on the record fault the Judge's action in this discretionary field.

Nor do we find any error in declining to certify the class action. Considering that the claim of sex discrimination was the very unique one that Smith was effeminate and the class representative was an applicant, not a contemporary employee, the Court could properly evaluate both the numerosity and the typicality factors. F.R. Civ.P. 23(a). This it did in its order[7] by

---

6. Although we do not rule on the issue, three circuit courts have decided that punitive damages are not recoverable in Title VII actions. *Richerson v. Jones*, 3 Cir., 1977, 551 F.2d 918, 926–28; *Pearson v. Western Electric Co.*, 10 Cir., 1976, 542 F.2d 1150; *EEOC v. Detroit Edison Co.*, 6 Cir., 1975, 515 F.2d 301, 308–10, *vacated and remanded on other grounds*, 1977, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267. Most district courts also have held that such damages are not recoverable. See cases cited in B. Lindemann Schlei & P. Grossman, Employment Discrimination Law 1258–59 (1976). *See also Johnson v. Railway Express Agency*, 1975, 421 U.S. 454, 458, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295, 300. District Courts in the Fifth Circuit, however, have split on the issue. *E. g., Howard v. Lockheed-Georgia Co.*, N.D.Ga., 1974, 372 F.Supp. 854 (punitive damages not allowed); *Claiborne v. Illinois Central R.R.*, E.D.La., 1975, 401 F.Supp. 1022 (punitive damages are allowed).

7. In part, the order read:
   The court first finds difficulty in accepting the notion that plaintiff's claims are typical of the purported class. To be typical, other members of the class should have same' or similar grievances. *See White v. Gates Rubber Company*, 53 F.R.D. 412, 415 (D.Colo. 1972). Plaintiff has not demonstrated to this court that there are other members of the class who have same or similar grievances. Plaintiff has alleged a single act of discrimination by defendant. He has done nothing more than make a conclusory allegation that defendant has discriminated against other members of the purported class.

declining to certify the class and leaving open Smith's right to reurge certification as the case developed. This he never did. Contrary to Smith's contentions, the Court did not ignore or misapply the requirements of *Alpha Portland Cement Co. v. Reese*, 5 Cir., 1975, 507 F.2d 607; *Sanchez v. Standard Brands*, 5 Cir., 1970, 431 F.2d 455; *Carr v. Conoco Plastics Inc.*, 5 Cir., 1970, 423 F.2d 57; *Johnson v. Georgia Highway Express*, 5 Cir., 1968, 417 F.2d 1122.

There was no showing that Smith was a member of any class beyond the "effeminant" group, or who or how many were in such class or classes or whether as an individual Smith had been or was in a position to sustain the same injury which would thereby qualify him as a class plaintiff. To be a class representative, Smith must be part of the class and "suffer the same injury" as the class members. *East Texas Motor Freight v. Rodriguez*, 1977, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453, 462, *quoting, Schlesinger v. Reservists Committee To Stop the War*, 1974, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706, 716. And since we must view the case as it comes to us now, the intertwined problem of proper representation was sharply raised by the purposeful, not inadvertent or accidental, failure of plaintiff Smith to appear at the trial. As a champion he could hardly enter the lists in absentia.

AFFIRMED.