800 F.2d 491
 41 Fair Empl.Prac.Cas. 1480,
41 Empl. Prac. Dec. P 36,539
Clayborn E. NASH, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
The CITY OF HOUSTON CIVIC CENTER, Defendant-Appellant, Cross-Appellee,
v.
Charlotte DUDLEY and Quida Sanderson, Movants-Appellants.
 No. 85-2388.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1986.
 
 John E. Fisher, Sr. Asst. City Atty., Jerry E. Smith, City Atty., Mark Thompson, Asst. City Atty., Houston, Tex., for defendant-appellant, cross-appellee.
 Monte S. Donaldson, Houston, Tex., for Dudley & Sanderson.
 David T. Lopez, Lopez & Associates, Houston, Tex., for Clayborn Nash, et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before REAVLEY and POLITZ, Circuit Judges, and ROBINSON*, District Judge.
 OPINION
 REAVLEY, Circuit Judge:
 
 
 1
 Present and former employees of the City of Houston claim class and individual discrimination by the City, violating Title VII of the 1964 Act, 42 U.S.C. Secs. 2000e to 2000e-17, as well as the 1866 Act, 42 U.S.C. Sec. 1981. The grievance of the class of black workers is that, as attendants in the parking division of the civic center department of the City of Houston, they worked the number of hours that would have entitled them to a different status if they had been building attendants or stagehands working in the auditorium division of the civic center department. The plaintiff class persuaded the district court that the parking attendants were victims of discrimination that was remediable under federal civil rights law because the disadvantage fell with disparate impact upon blacks inasmuch as most of the parking attendants were black. That court awarded 37 black workers retroactive benefits and enjoined the City from denying to employees in the parking division the same benefits given to employees elsewhere in the City's employ.
 
 
 2
 The City is appealing the judgment in favor of the members of the class as well as the recovery awarded for three individual claims. The plaintiff class appeals the definition of the class and urges its enlargement. Two white women parking attendants appeal the denial of their attempt to intervene. Because this is not a case of racial discrimination, we reverse the judgment in favor of the class and order dismissal. We hold the findings in favor of Clayborn Nash and Romie Blount to be clearly erroneous and their claims to be without merit, and we order them dismissed. We uphold the denial of intervention by Charlotte Dudley and Quida Sanderson. Finally, we affirm the judgment against the City in favor of Alvin Moore.
 
 
 3
 I. Background of the Claim of the Plaintiff Class
 
 
 4
 The City of Houston Civic Center consists of several large facilities, music halls, convention center and coliseum, together with parking garages. Approximately 300 people are employed by this department of the city government. One of the divisions in this department is the parking division, and most of the employees there are termed parking attendants. Most of those parking attendants are classified as part time employees and though they are paid a good hourly wage, they are only paid for the hours they work and do not obtain civil service status. That status would carry with it vacation and sick time, eventual pension benefits, as well as job security.
 
 
 5
 When the parking division began operating in 1967, and for several years thereafter, most of the attendants were white. The plaintiff Alvin Moore was manager of the parking division from 1972 to 1976, and over those years while he was in charge of hiring, the racial mix changed until black workers dominated. Moore and his black assistants also did the scheduling and assignment of hours, and during the years 1975 to 1981 it became common for parking attendants classified as part time employees to work 40 or more hours a week. The assignment of full time and overtime hours to part time attendants was stopped by a new department director in May of 1981. However, during the 1970's the parking attendants became aware of the benefits of civil service status accorded generally to full time employees and sought to obtain it for themselves, eventually filing suits that were consolidated into the one at hand.
 
 
 6
 The record demonstrates an open policy of hiring and promotion throughout the departments of the City of Houston. In 1977 when this suit was filed, and throughout the following four years, a much larger percentage of blacks was hired in nearly every level and category of city employment than the proportion of blacks in the general population. From 1975 through 1981 the percentage of blacks in part time employment, as well as the percentage in full time employment, was substantially greater than the percentage of blacks in the population. In the civic center department itself, full time positions filled by either hiring or promotion from December 2, 1976 to June of 1980 numbered 33 blacks and 23 whites. From June 1980 to the date of the trial, positions were filled by 54 blacks and 37 whites. While there is some discussion by plaintiffs about the "classification" of the employees, there is no suggestion at all in the evidence that blacks were channeled into menial positions while whites were directed into better jobs.
 
 
 7
 The trial court found that, over the period 1975 to 1981, the parking attendants who actually worked full time included 98 (66%) who were black, 36 (23%) who were hispanic and 14 (11%) who were white. The parties stipulated that in 1978, the year after Clayborn Nash began this suit, there were 238 employees in the civic center, of whom 70 (30.6%) were white and 135 (56.7%) were black. There were then 45 part time employees in the department, and 38 of these were black.
 
 
 8
 In 1981 the class was certified to include "all Black past and present Black employees of the City of Houston who work or worked on a full time basis but are classified as part time employees because of their race who claim they were denied civil service status...." The class was redefined and finally amended to specify those parking attendants "who worked 50 weeks consecutively and averaged at least 40 hours per week at any time during the relevant time period."
 
 
 9
 The trial court found that there was no proof of discrimination in hiring, either in the civic center department, or city wide. Though the court felt that there was a problem for a part time employee who wished to move into a civil service job, it acknowledged that four part time black employees of the parking division secured civil service jobs in the department following 1974, whereas no white part time parking attendant did so. The district court observed that no evidence was presented to show that the practices of the City with respect to the parking attendants prevented the plaintiff class from securing jobs which similarly situated whites obtained. What the court found objectionable was that parking attendants might work more than 40 hours a week without obtaining civil service status, whereas no employees working comparable hours in the convention or auditorium divisions were without that status.
 
 
 10
 The court regarded that disparity as a condition of employment that fell more harshly on blacks than whites because there were more black parking attendants. It concluded, therefore, that the plaintiff class had presented a prima facie adverse impact case. Then the court rejected the business necessity explanation of the defendant City, an explanation that the City desired a ready pool of parking attendants for a widely fluctuating demand. The court found that there was enough work to occupy a number of the attendants full time and that the City did not need to keep them at part time. The same statistic, the larger number of blacks in the disfavored position, was held by the court to establish a prime facie disparate treatment case. Again, the explanation for the policy was rejected as pretextual. And the City was therefore held to be liable to the class. The 37 class members who were identified were awarded additional backpay totalling $269,827.08 plus pension rights.
 
 II. Discussion
 
 11
 A cue to the infirmity of the plaintiff class claim may be observed by the argument here of the white parking attendants who were denied intervention, and also by the terms of the trial court's injunction. Charlotte Dudley and Quida Sanderson appeal the denial of their petition for intervention, arguing that the only difference between them and the plaintiff class is their race and that they suffered the very same discriminatory treatment by having worked more than 40 hours each week without being given civil service status.[1] While their argument fails to display a violation of their own civil rights, it does signal that the similarly situated black plaintiff class has misdirected its grievance and suffered no civil rights violation. The other cue lies in the wording of the injunction ordered by the district court. The City is ordered to give the parking division employees the same benefits and status it gives to its employees in other divisions and departments.[2] The decree directs the City on the compensation of its parking attendants and neither mentions nor purports to alleviate or affect any racial disadvantage.
 
 
 12
 This is not a case of racial discrimination. City workers in the parking garages observed stagehands and building attendants, workers on different jobs, who benefitted from civil service while the parking attendants did not. Plaintiffs convinced the district judge of the unfairness of giving others civil service status while denying it to the parking attendants, and they colored their cause with race by pointing out that there were more black than white parking attendants. Thereby they arrived at a disparate impact. This exercise loses sight of the federal civil rights laws. The City of Houston has not been shown to maintain a racial barrier to equal employment opportunity. There is no competition between races reflected in this record. There is no discrimination against blacks, and there is no instance or practice of job selection that prefers non-blacks over blacks. Blacks are not disadvantaged in relation to whites. If any unfairness or discrimination on the part of the City has been shown, it is not a treatment of some people less favorably than others because of their race, color, religion, sex or national origin. The record reflects neither an intent to discriminate on the basis of race nor any procedure that does in fact adversely affect blacks because of their race. This case represents an attempt to use Title VII to change the compensation schedule for the City, but Congress has not sought "to limit an employer's right to exercise his informed judgment as to how best to run his shop." Willingham v. Macon Telegraph Publishing Co., 507 F.2d 1084, 1092 (5th Cir.1975).
 
 
 13
 The district court found that the plaintiff class had proved both a case of disparate impact and disparate treatment. There is no legal or factual support for those conclusions. A Title VII violation may be proved by evidence of the employer's unjustified use of some test or job requirement that applies to all employees or prospective employees but which adversely affects a particular race. See Carroll v. Sears, Roebuck & Co., 708 F.2d 183, 188-190 (5th Cir.1983); Pouncy v. Prudential Insurance Co. of America, 668 F.2d 795, 799-802 (5th Cir.1982). The basis for the finding of disparate impact here is the notion that while workers on other jobs had civil service status, parking attendants did not, and that since most parking attendants were black, the impact of the discrimination was racially disparate. That notion turns the statute and precedent upside down.
 
 
 14
 More black parking attendants worked full time without civil service status because blacks were hired (by black supervisors) and given high hours of work (by black supervisors). If there was any racial unbalance in the ranks of the parking attendants, it favored the blacks. Those who enjoyed civil service benefits in jobs outside of the parking division were black as well as white. The choice or imposition of civil service was not tied to race, but to the job itself.
 
 
 15
 No objection is made to the classification of part time employees. Federal law does not require that all employees work 40 hours or more each week. Nor do the plaintiffs object to the number of hours they have worked. They were assigned those hours by their black supervisors, including the plaintiff Alvin Moore. The new director ordered in 1981 that the number of part time attendants' working hours be kept below 40, and plaintiffs agreed at trial that the new policy would not be objectionable under federal law. Those blacks fortunate enough to have worked more than 40 hours each week during the years preceding this trial simply seek by their suit to obtain additional benefits. Since nearly all of the parking attendants are males, they could have brought a sex discrimination suit and made precisely the same arguments that the black class makes here. The impact of the denial of civil service would have weighed as heavily against the males as against the blacks. Of course, there was no sex discrimination by the City, but then there has been no race discrimination either.
 
 
 16
 The district court found disparate treatment as well as disparate impact, but it relied on the same "statistical" proof of impact against blacks for the proof of discriminatory intent. Gross disparity in the treatment of workers, measured by race, may present a prima facie case of disparate treatment. Hazelwood School District v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). That disparity tends to prove a discriminatory intent of the employer. The disparity in the present case does not tend to prove an intent adverse to blacks. The blacks are ahead in the parking attendant selection. If more blacks are "impacted" by the lack of civil service benefits, the fewer non-blacks are "impacted" the very same. Except for that statistical headcount of the parking attendants, and the fact that all races in one division receive benefits that differ from what all races receive in another division, the plaintiff class has nothing to show. That falls short of proof that the City has intentionally or unintentionally discriminated against black employees.
 
 III. Individual Claims
 A. Clayborn Nash
 
 17
 Nash was told not to come back to work after he absented himself from his assigned position on February 17, 1977. In a meeting with the director and assistant director other complaints about his performance were discussed, including his leaving valid and unused parking tickets on the floor of a garage and blocking traffic by sitting in his car to issue tickets. He was never recalled to work. On April 11, 1977 Nash wrote a letter to the civil service director of the City to protest a conspiracy against him by the civic center department director and assistant director and to charge the department with discrimination and inefficient practices. On April 14 the director wrote Nash to tell him that his name would no longer be carried on the parking attendant lists and explaining the reasons as those discussed in their February meeting.
 
 
 18
 The district court found "a causal connection between his complaint on April 11, 1977 and his termination three days later" and that "Nash was fired in retaliation for his opposition to the City's racially discriminatory employment practices." This finding is clearly erroneous. Nash, by pleading and testimony, has always claimed that he was discharged because he was black and never has there been any testimony or claim that the termination was in retaliation for the April 11 letter or other act. In his complaint he alleged that he was discharged because of his race and the proposed findings of fact as well as the pretrial order stated Nash's claim as predicated on racial animus. His misconduct on the job had led to his work being discontinued long prior to the letter of April 11. The action taken against Nash two months earlier can hardly be said to be pretext to cover a retaliation for Nash's later letter.B. Romie Blount
 
 
 19
 Blount testified that his working hours were reduced after he filed with the Equal Employment Opportunity Commission (EEOC) a charge of discrimination (based on the part-time classification) on January 7, 1981, and that he was discharged from his position as parking attendant on September 16, 1981. The City promptly rehired Blount to work in another division as a full time mechanic with civil service benefits. However, the district court found that his hours were reduced in retaliation for his civil rights charge, awarded him $6,350 for loss of wages and emotional distress, and ordered deletion of the City record of his discharge for insubordination.
 
 
 20
 The record will not support the trial court's findings, and we conclude that they are clearly erroneous. Blount's own testimony, as well as the city records and unanswered testimony of his supervisors, proved his insubordination and unwillingness to work under the direction of his superiors in the parking division. Prior to any purported retaliatory action of which Blount complains, he had been reported by supervisors Hearne and O'Koli for several instances where he refused to work where he was assigned. He had demanded the removal of the parking manager and had called the assistant director of the department a liar. The assistant director had recommended that Blount be fired because the parking manager was unable to obtain Blount's cooperation on the job. Two meetings were held by the supervisors with Blount, one in October 1980 and another in September 1981 when he was finally discharged. Both meetings, under Blount's own version, were unacceptable to those under whom he had to work. He told his superiors that they were lying and he showed no disposition to cooperate. One might understand the City rehiring Blount despite his unwillingness to follow instructions of supervisors in the parking division, but if the objective were to punish him for an EEOC filing, it is highly unlikely that he would instead be reinstated in a better position in a different City department. The record is clearly at odds with a finding that the City acted against Blount to retaliate for his EEOC charge. We have the definite and firm conviction that the district judge committed a mistake.
 
 C. Alvin Moore
 
 21
 Moore testified by deposition that he would not have discharged Nash if it had been for him to decide. This content of his deposition was subsequently reported by Moore to his supervisor. At the trial Moore testified that this superior was said by others to have become personally antagonistic to Moore. When a new parking division manager was selected on April 14, 1980 three months after the superior was told of Moore's testimony, Moore's application was rejected. Moore himself had occupied this position from 1972 to 1976.
 
 
 22
 The district court found that Moore was denied the promotion to parking manager in retaliation for his testimony in support of Nash's civil rights claim. The court awarded additional back pay from April 14, 1980 to January 17, 1984 when the position was abolished. While we are inclined to believe that there was merit in the reasons given by the City for choosing the successful applicant and not Moore to be manager, and while we are disturbed by the other findings made in this case by the district judge, we are unable to say that this particular finding was clearly erroneous. Because there are two permissible views of the evidence, we must affirm. See Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The record convinces us that only trivial effort was expended by counsel on Moore's personal claim and that remand for consideration of attorney's fees isolated for this cause is unwarranted. If affidavits to the contrary are presented on motion for rehearing, they will be considered.
 
 IV. Conclusion
 
 23
 The judgment of the district court against the City and in favor of the plaintiff class, Clayborn Nash and Romie Blount is reversed, and those claims are dismissed. The order of injunction is vacated. The denial of the petition for intervention by Charlotte Dudley and Quida Sanderson is affirmed. The judgment in favor of Alvin Moore against the City is affirmed.
 
 
 24
 AFFIRMED in part and REVERSED in part.
 
 
 
 *
 District Judge of the Northern District of Texas, sitting by designation
 
 
 [1]
 In their brief Dudley and Sanderson argue:
 "DUDLEY-SANDERSON were always considered by the Defendant as part of the group of employees employed as parking attendants and classified as part-time employees. They worked the same hours and under the same conditions as all of the other parking attendants, thereby incurring the same employment and economic discrimination as Plaintiffs. To say they have not suffered the same discrimination because they are not black employees is not accurate. Work records submitted to the trial court showed that DUDLEY-SANDERSON both worked an average of forty (40) hours or more per week, thus meeting one of the criteria stated in Additional Finding of Fact No. 1 which was entered by the trial court on April 17, 1984 in defining the Class. They attended meetings with all of the other employees in this group and contributed financially to the initial legal expenses incurred by the group in filing the suit. Some contributions were made directly to the Plaintiff's attorneys and others were made to Plaintiff's representatives who passed the funds on to the attorneys. Copies of the records showing the number of hours worked by DUDLEY and SANDERSON and their financial contributions are attached as exhibits to the Motion to Intervene filed on their behalf and filed here for review. DUDLEY-SANDERSON were assured that they would be members of any class action brought on behalf of the parking attendants. DUDLEY-SANDERSON did not learn until June, 1984 that they were not part of the class; their motion to intervene was timely filed shortly thereafter on July 6, 1984, some 10 months prior to Final Judgment."
 
 
 [2]
 The final judgment of the district court orders:
 That the City of Houston be and hereby is permanently enjoined from denying to any employee in the Civic Center Parking Division the same status, benefits, and privileges generally accorded to its employees, including, but not limited to those in its ordinances and procedures related to civil service, compensation policies including those providing for longevity pay, employment benefits including sick leave and vacation, insurance benefits, and personnel policies including those related to promotion and transfer.
 Further that the City of Houston is permanently enjoined from establishing or maintaining any ordinance, policy or procedure with respect to the hours of work, rates of pay, and terms and conditions of employment or employees in the Civic Center Parking Division which is inferior to that generally applicable to employees of the City of Houston covered by the ordinances relating to civil service, or which discriminates against, limits, segregates or classifies employees of the Civic Center Parking Division in any way which would deprive or tend to deprive them of employment opportunities or otherwise adversely affect their status as employees.